JMM:BTR
F.#2010R00701

**FILED**
**IN CLERK'S OFFICE**
**DISTRICT COURT E D N Y**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK   JUN 15 2010

**LONG ISLAND OFFICE**

**10 - 0679M**

- - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

LEESA SHAPIRO, also
    known as "Leesa Willett,"
    and "Leesa Shapiro-Willet,"

        Defendant.

AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR AN
ARREST WARRANT

M. No. _____
(T. 18, U.S.C., §§ 1349)

- - - - - - - - - - - - - - - -X

EASTERN DISTRICT OF NEW YORK SS:

        JILL S. TURNER, being duly sworn, deposes and says that she is an agent of the Federal Bureau of Investigation, ("FBI") duly appointed according to law and acting as such.  This complaint is based on information and belief the source of that information and the basis of my belief being personal observations and direct knowledge, discussions with other agents, and confidential sources which established that [1]:

        In or about and between 2005 and the date of the filing of this complaint, both dates being approximate and inclusive, within the Eastern District of New York, the defendant LEESA SHAPIRO, also known as "Leesa Willett," and "Leesa Shapiro-Willet," together with others, did knowingly and intentionally

_____

    [1] As this affidavit is submitted only to illustrate that probable cause exists to believe that the crimes alleged have been committed by the defendant, all the facts known to me as a result of my investigation have not been included.

execute a scheme and artifice to obtain money, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, to wit: mortgage lending businesses, by means of false or fraudulent pretenses, representations, or promises.

(Title 18, United States Code, Sections 1349 and 1344)

1.   I am an agent of the Federal Bureau of Investigation ("FBI") and have been assigned to the Long Island Resident Agency ("LIRA"), New York division for the past 22 years.  I have been an FBI agent since 1987.  During that time I have been assigned to the enforcement of laws involving white collar crime, including mortgage fraud, and have been assigned to hundreds of such investigations.

## SUMMARY OF INVESTIGATION

2.   This investigation has established that the defendant LEESA SHAPIRO ("SHAPIRO"), an attorney licensed to practice in New York State, in order to hide her own interests, routinely paid individuals to make false mortgage applications as so called "straw borrowers."  The straw borrowers represented themselves as the mortgagors in real property transactions, when, in fact, they were acting on behalf of the defendant who wished to hide her involvement in real estate investments.  Furthermore, the defendant LEESA SHAPIRO helped to falsify loan documents and mortgage applications, divert monies from her attorney-client

escrow account for her own use, and transferred money overseas to hide assets from the New York State courts.  In this manner the defendant obtained over $2.3 million in fraudulent loans from financial institutions and caused losses of approximately one million dollars.  Representative of these frauds, are the following transactions:

**Fraudulent Mortgage Applications:**

3.    Probable cause to arrest is based, in part, on Cooperating Witness No. 1 ("CW-1), who has pleaded guilty to conspiracy to commit mail fraud and conspiracy to launder money. CW-1's information has been corroborated by various mortgage documents and independent debriefings of witnesses.  Accordingly, I deem CW-1 to be reliable.  CW-1 has admitted participating in a series of fraudulent mortgage applications with the defendant LEESA SHAPIRO.  CW-1 was a mortgage broker for Alliance Mortgage Banking Corp. of Levittown, New York ("Alliance").  CW-1 first met with the defendant SHAPIRO in 2005.  The defendant introduced herself as a real estate attorney, going through a divorce, who was interested in investing in distressed residential properties, and fixing and/or re-selling the property for a profit.  SHAPIRO also indicated that she had funds available to her and could act as a private lender.

**131-21 MATTHEWSON COURT, SPRINGFIELD GARDENS, QUEENS, NEW YORK**

4.    During the Summer of 2005, SHAPIRO employed a

woman, Cooperating Witness No. 2 ("CW-2") as a part-time babysitter and tennis instructor, living in SHAPIRO's home on Berryhill Road, Syosset, Long Island, New York.  CW-2's information has repeatedly proven reliable.  In the summer of 2005, SHAPIRO told CW-2 that she needed CW-2 to act as the applicant on a mortgage for a house that SHAPIRO was interested in buying as an investment.  This house was a single family residence, located at 131-21 Matthewson Court, Springfield Gardens, Queens, New York.  SHAPIRO told CW-2 that because of her divorce proceedings, she did not want to use her own name on the deed or mortgage documents.  SHAPIRO advised that she would take care of everything and would pay CW-2 $5,000 at the closing and another $5,000 when the house was sold.  These payments to CW-2 were for the use of CW-2's name on the property and the mortgage. SHAPIRO promised CW-2 that the transaction would be over in five to six months and that SHAPIRO would be financially responsible for the mortgage and any other expenses.  CW-2 agreed.

     5.    On or about February 2006, SHAPIRO called CW-1 to arrange the preparation of a mortgage application for CW-2.  CW-1 and SHAPIRO prepared a fraudulent mortgage application to qualify CW-2 for a mortgage.  SHAPIRO falsely identified CW-2 on the application as a legal assistant for the defendant who supposedly earned a salary of $7,450 per month.  SHAPIRO and CW-1 also falsely claimed in the application that CW-2 maintained $35,000

in savings in a fictitious Washington Mutual Bank account, and
that the house at 131-21 Matthewson Court, Queens, New York
("Matthewson Court") was going to be CW-2's primary residence.
As no down payment was made on the property, CW-1 and the
defendant SHAPIRO submitted the false application in two separate
mortgage applications.   Neither loan application acknowledged the
other loan.   One loan was for $88,000 and the second loan was for
$352,000.   The two mortgages totaled $440,000 the purchase price
of the house.   By submitting two loans, neither acknowledging the
other, CW-1 and SHAPIRO could arrange to improperly obtain
funding for 100% of the purchase price of the house.   CW-1 and
SHAPIRO were aware that the false financial history was
sufficient for Alliance to approve and fund each mortgage.
CW-1 and SHAPIRO were also aware that Alliance would then quickly
sell the two fraudulent mortgages to two separate third party
financial institutions after the closing.

      6.   On March 17, 2006, the closing occurred for the
purchase of Matthewson Court occurred at a law office on Long
Island.   The defendant SHAPIRO appeared as the attorney for CW-2.
The two mortgages, funding over 100% of the purchase price of the
property, covered the closing costs for the purchase of the
property as well.   Out of the proceeds of the purchase, SHAPIRO
had a check drawn to herself as attorney for CW-2 in the amount
$16,807.49.   That same day SHAPIRO wrote a check from her

attorneys escrow account to CW-2 for $5,000.[2]

7.    After the closing on Matthewson Court, the mortgages were re-sold by Alliance and the false mortgage documents passed by mail or interstate commercial carriers to mortgage investment companies outside of New York, each of whom arranged to mail mortgage payment information to CW-2.  CW-2 never made any payments on the mortgages, nor did SHAPIRO make any payments towards the Matthewson Court mortgages.  Nor was the house quickly resold as promised by the defendant SHAPIRO. Following months of non-payment the mortgage companies started collection and foreclosure efforts against CW-2.  CW-2 confronted SHAPIRO, who stated she would take care of it.   SHAPIRO took no steps to remedy CW-2's role as a "straw buyer" for the defendant. The building in CW-2's name went into foreclosure and the various financial companies, Caddlerock Joint Venture and United Servicing, lost over $215,000 based on the fraudulent mortgages.

## 97-20 JAMAICA AVENUE, QUEENS, NEW YORK

8.    As her divorce proceeded, SHAPIRO again approached CW-1 and indicated that she wished to obtain a mortgage for over a half-million dollars to withdraw the equity on a commercial building she claimed she owned at 97-20 Jamaica Avenue, Queens, New York ("Jamaica Avenue").  SHAPIRO claimed that the property

---

[2]New York State law and regulations prohibit an attorney from using their escrow account for personal expenses and commingling escrow funds. Code of Professional Responsibility, Rule 1.15

was held by a corporation that she owned named Corporate Capital Realty Corp ("Corporate Capital").  CW-1 prepared a mortgage application to Flushing Savings Bank to mortgage the building, and to withdraw equity from the building.  The bank required SHAPIRO to sign a corporate resolution, which she did in April 10, 2006.  In that document she represented that she was a 100 percent owner and president of Corporate Capital and was authorized to obtain the mortgage for the corporation.  In fact, she was only a part owner of the corporation, having an equal share of ownership with her then husband, who was the president of the corporation.  SHAPIRO did not have authority to obtain a mortgage on the property.

9.  The mortgage closed on April 10, 2006 in the bank's attorney's office in the Eastern District of New York.  Checks totaling $584,643 were written by Flushing Savings Bank in reliance on defendant's false mortgage application.  $546,643.36 was issued in a check directly to the defendant SHAPIRO.  She endorsed that check and deposited it into her attorney escrow account.  Various mailings were sent to collect on that mortgage, however, SHAPIRO, despite collecting rent from the commercial tenants,  failed to maintain the mortgage.  Foreclosure proceedings were threatened and the property was sold to third parties to settle the Flushing mortgage.

## 84 CORNELIA STREET, BROOKLYN, NEW YORK

10.   While awaiting the commercial mortgage closing on Jamaica Avenue, SHAPIRO solicited Cooperating Witness No. 3 ("CW-3") to act as a "straw borrower" on her behalf in another fraudulent mortgage loan.   In this scheme SHAPIRO proposed to buy, rehabilitate and re-sell a derelict residence located at 84 Cornelia Street, Brooklyn, New York ("Cornelia Street").   CW-3 whose information has been corroborated and is deemed to be reliable, has known SHAPIRO for over 20 years.   According to CW-3 SHAPIRO told CW-3 that she had "a great deal" in connection with a property investment, but could not purchase any properties in her own name because she had purchased too many properties that year.   SHAPIRO told CW-3 that she would handle everything including fixing up the property, paying the mortgage and re-selling the property.   SHAPIRO promised to pay CW-3 $5,000 for allowing SHAPIRO to use her name and credit history on the loan application.   CW-3 agreed.

11.   SHAPIRO again approached CW-1 to prepare a fraudulent mortgage application through Alliance.   This mortgage application was for CW-3.   SHAPIRO told CW-1 that given the pending divorce, she was hiding assets from her husband.   CW-3's application falsely reflected that CW-3 had a monthly income of $13,750 and had another $90,000 in an account at Citibank.   SHAPIRO also provided a fraudulent escrow letter reflecting that

she was holding a down payment by CW-3 for the property.   In
fact, no down payment existed.   SHAPIRO reported to CW-1 that the
property was derelict and she had attempted to remove squatters
from the building.   Thereafter, CW-1, an appraiser and SHAPIRO
discussed the necessity of obtaining an inflated appraisal for
the property to cover the purchase price.   SHAPIRO also arranged
with CW-1 to obtain two checks at the closing from the mortgage
proceeds at the closing.   One check for $12,000 would be issued
to Corporate Capital, although the company had no involvement in
the transaction.   SHAPIRO also requested a second check for
$13,000 issued in her own name as attorney for CW-3.   SHAPIRO
represented that these checks were needed to fund repairs to the
property and to cover mortgage payments until SHAPIRO could re-
sell the property.   The false mortgage application and appraisal
resulted in an approved mortgage by Alliance for $650,000 on the
Cornelia Street property, well in excess of the property's
market value.

    12.   The closing on Cornelia Street took place at a law
firm in Garden City, New York on June 28, 2006.   Loan
disbursement checks reflect checks issued to Corporate Capital
and to SHAPIRO, as attorney.   Examination of these checks shows
they were deposited by SHAPIRO into the defendant's escrow
account.   On June 29, 2006, SHAPIRO wrote a check to CW-3 in the
amount of $5,000 from her attorney escrow account.

13.   SHAPIRO never repaired or resold Cornelia Street.
Instead, the fraudulent mortgage was quickly sold by Alliance to
EMC Mortgage Company of Irving, Texas and GMAC Mortgage of
Waterloo, Iowa.

14.   Mortgage payments were not made as promised by
SHAPIRO.   CW-1 complained when he found that SHAPIRO had not used
the money to Corporate Capital and to her as attorney to fund
repairs and make mortgage payments.   SHAPIRO admitted that while
some of the money was used for mortgage payments most was used
for other things.   CW-3 complained to the defendant that SHAPIRO
had not made any payments on the mortgage as promised.   SHAPIRO
assured CW-1 and CW-3 that she was dealing with a third-party to
try to obtain funds for mortgage payments.   In March or April of
2007, CW-3 witnessed an unidentified black male give $6,000 in
$20 bills to the defendant SHAPIRO to make a mortgage payment.
The defendant SHAPIRO stated to CW-3, "I told you the money was
coming."  An examination of SHAPIRO's bank records by your
deponent indicates that on March 29, 2007, the defendant SHAPIRO
deposited monies and wrote a check from her Commerce Bank account
number 7923068956, in the amount of $5,866.74 to CW-3.   The memo
section contained the following: "EINC GMAC."  CW-3 used these
funds to make a mortgage payment on Cornelia Street.   No further
payments followed.   Cornelia Street is currently in foreclosure
and a loss of over $600,000 is expected due to the fraudulent

mortgage loan.

## 118-07 14TH ROAD COLLEGE POINT, QUEENS, NEW YORK

15. A fourth false mortgage application arranged by SHAPIRO was described by CW-1. SHAPIRO entered a contract to buy 118-07 14th Road College Point, Queens, New York ("14th Road"), a foreclosed residential property from a bank and sought to quickly re-sell it before the contract required her to close and take ownership. However SHAPIRO ran out of time, had not made any improvements to the building and could not re-sell it. She was in jeopardy of losing her down payment. Since a legitimate buyer could not be found, SHAPIRO had a "straw buyer," Elton Jacobs, an acquaintance referred from her friend Marshall Stuart, was recruited to buy the property. SHAPIRO offered to pay the "straw buyer" thousands of dollars to apply for two mortgagees in the amounts $572,000 and $143,000, totaling $715,000. SHAPIRO intended to use monies from the mortgages to complete her plan to fix and re-sell the property.

16. Alliance approved these fraudulent mortgages and the closing occurred on February 27, 2007 in Garden City, Long Island. Checks disbursed at closing show a check in the amount of $24,942.23, made out to Marshall Stuart. That check was endorsed with the name "Marshall Stuart, for deposit only," and deposited in Commerce Bank account number 7923929256. Bank records from Commerce Bank indicates that this is an account

number for a personal account in the name "Leesa Shapiro-Willett." The Stuart check was deposited and credited to this account. A second check from Alliance, issued at the closing in the amount of $25,750, was payable to Helene Shapiro, the defendant's mother. A third check from the closing was made out to the defendant SHAPIRO in her married name, Leesa Willett in the amount of $5,000. The defendant took all these checks and deposited them. Jacobs never took possession or lived at that property, as represented on the loan application, and no mortgage payments were ever made on the two mortgages taken out in Jacobs name by SHAPIRO.

**Escrow Account Irregularities**

17. Your deponent has reviewed the defendant's attorney escrow account. Records show that the defendant has not maintained her client's monies in separate accounts as required by the New York State Code of Professional Responsibility. Rather my examination SHAPIRO's attorney escrow account, HSBC account number 95470048, shows monies from clients commingled with deposits of the proceeds obtained from the fraudulent mortgage applications described above as well as monies paid to her for using certain Title Companies at closings, and money from other sources, including unreported foreign bank accounts. The New York State Grievance Committee for the State of New York inform me that this commingling is a violation of the Rules of

Professional Conduct for admitted attorneys in the State of New
York.  SHAPIRO has also admitted to the New York State Grievance
Committee arranging for kickbacks from Title companies in
closings she arranged, such payment are a violation of federal
regulations, the Real Estate Settlement Procedures Act("RESPA").
Numerous payments of that type are reflected in the escrow
account.  The escrow account also shows numerous personal
expenses the defendant paid directly through her attorney's
escrow account, as follows:

| Check No. | Date | Amount | Payee |
|---|---|---|---|
| 5828 | 3/31/06 | 25,000.00 | Blank and Rome LLP  (Divorce Counsel) |
| 5832 | 4/10/06 | 6,678.54 | Central Mortgage Co (Defendants Syosset house) |
| 5844 | 4/25/06 | 1,000.00 | Pine Hollow Country Club |
| 5866 | 5/12/06 | 9,000.00 | Leesa Shapiro |
| 5908 | 5/24/06 | 3,000.00 | Leesa Shapiro |
| 5909 | 5/24/06 | 3,600.00 | Leesa Shapiro |
| 5911 | 5/25/06 | 1,000.00 | Village of Oyster Bay Cove |
| 5901 | 5/19/06 | 172.50 | Pine Hollow Country Club |
| 5876 | 7/1/06 | 6,678.54 | Central Mortgage Co. |
| 5939 | 8/8/06 | 6,000.00 | Leesa Shapiro |

18.  Finally, on July 22, 2006, SHAPIRO made a deposit
into her escrow account of $29,000.  The deposit was a bank
check, the remitter was SHAPIRO, paid to the order of "Leesa
Willett."  The endorsement on the check contained the signature
of Leesa Willett for deposit only, account number 0851052, Banco
BHD, which was determined to be located in the Dominican
Republic.  According to CW-1 SHAPIRO told CW-1 she transferred
money to and from BHD Bank in order to hide funds from her ex-

husband and the State of New York Courts.   SHAPIRO's ex-husband confirms no foreign bank account were reported by SHAPIRO in tax returns. While they were married, nor in the State divorce proceedings.

WHEREFORE, your deponent respectfully requests that a warrant issue so that the defendant may be dealt with according to law.

_____
JILL S. TURNER
Special Agent
Federal Bureau of Investigation

Sworn to before me this
15th  day of June 2010

E. THOMAS BOYLE, MJ
_____
HON. E. THOMAS BOYLE
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK
THE GRAND JURY CHARGES: